

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

FILED
JUL 1 4 2022

| | |
|---|---|
| TANYA SVENDSEN, | 1:21-CV-1029-CBK |
| Petitioner, | |
| vs. | |
| KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM AND ORDER** |
| Respondent. | |

Tanya Svendsen ("petitioner," "claimant") moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 and 42 U.S.C. § 405(g), for judgment as a matter of law concerning her denial of Social Security Disability Income benefits. Doc. 10. As this Memorandum and Order will explain, the petitioner raises a host of issues, namely:

(1) Whether the Administrative Law Judge ("ALJ") properly identified all impairments and their severity;

(2) Whether the administrative judge properly evaluated fibromyalgia and headaches within the context of their medically equivalent Listings;

(3) Whether the Residual Functional Capacity ("RFC") found by the ALJ was supported by substantial evidence on the record, specifically within the context of fibromyalgia, two separate treating source opinions, manipulative limitations, and sit/stand option determinations;

(4) Whether the ALJ properly evaluated Ms. Svendsen's subjective symptoms; and

(5) Whether the ALJ erred in solely looking at available jobs related to petitioner's RFC within the national economy, and not delving into a more specific regional analysis.

Acting Commissioner Kilolo Kijakazi ("Commissioner," "respondent") argues the ALJ below was proper in her denial of benefits and that this Court should affirm her

decision.  This Memorandum and Order will explain why petitioner's claim should be granted in part and denied in part.

## I.      BACKGROUND

Ms. Svendsen is a 46-year-old resident of Aberdeen, South Dakota, suffering from a host of ailments, including degenerative disc disease to the cervical spine, degenerative joint disease to the right shoulder, obesity, fibromyalgia, headaches, type 2 narcolepsy, lumbar spondylosis, anxiety, and depression.  The claimant protectively filed her Title II application on October 4, 2018, for a period of disability and disability insurance benefits, alleging disability beginning on September 1, 2018.  Ms. Svendsen's claim was first reviewed at the initial stage by a State agency physician on March 1, 2019, who found she had severe disorders of her back-(discogenic and degenerative), migraines, and fibromyalgia.  The State review also found non-severe impairments of "other disorders of the nervous system," "depressive bipolar and related disorders," and "anxiety and obsessive-compulsive disorders."  See Administrative Record ("A.R.") 1354–70.  Further, the State physician concluded that the claimant could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and stand and/or walk for a total of six hours in an eight-hour workday, with no inhibition on her ability to lift and/or carry or crawling.  The physician also found that Svendsen had limited reaching ability overhead for both arms, chronic neck pain, and non-severe narcolepsy.  No sit/stand option opinion was offered.

Next, the petitioner's claim was reviewed by another State agency physician at the reconsideration stage on November 19, 2019.  See id. at 1372–78.  There, the reconsideration stage physician made markedly similar findings, parting ways with the initial review by finding Svendsen had severe chronic fatigue syndrome and could only crawl occasionally.

On December 17, 2020, Judge Brenda Rosten, a North Dakota-based ALJ, issued her decision denying Svendsen's application for disability benefits.  See id. at 15–28.  Accordingly, the proper inquiry for scrutinizing whether petitioner is statutorily disabled is from September 1, 2018, to December 17, 2020.

Specifically, the ALJ concluded that Ms. Svendsen met the insured status requirements through September 30, 2021, and that she has not engaged in substantial gainful activity since September 1, 2018 (the alleged onset date). Further, the administrative judge determined that the claimant had severe impairments of degenerative disc disease to the cervical spine, degenerative joint disease to the right shoulder, obesity, and fibromyalgia. She did not find any other impairments to be severe. Next, the administrative judge found that Svendsen did not have an impairment, or combination of impairments, that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Next, we consider the RFC. The ALJ held that the claimant has a RFC to perform a range of sedentary work as delineated in 20 C.F.R. § 404.1567(a). The judge concluded that Svendsen can lift and/or carry ten pounds occasionally and less than ten pounds frequently; that she can sit for approximately six hours in an eight-hour workday (with the ability to stand up and/or change position for roughly two to three minutes after sitting for an hour); and can stand and/or walk for a combined four hours in an eight-hour workday, among other findings. In making these determinations Judge Rosten found Svendsen's treating physician Dr. Jacob Miller's conclusions – which were presented in a checklist style form – "unpersuasive," and treating physician Dr. Richard Hardie's findings "less persuasive." Id. at 26.

Having determined the petitioner's RFC, the ALJ concluded that she is unable to perform any past relevant work. Classified as a younger individual (within the range 18–44 at the time of the ALJ's opinion), the ALJ noted Ms. Svendsen has at least a high school education and ultimately concluded that the transferability of past job skills was immaterial since the Medical-Vocational Rules framework supported a finding that the claimant was not disabled, negating the need to tackle whether past skills were in fact transferable. Finally, the ALJ turned to a Vocational Expert ("VE") to discern whether there were significant jobs in the national economy that the petitioner could perform, given her age, education, work experience, and RFC. Looking only to national numbers, the VE found in the Dictionary of Occupational Titles three such positions: (1) a

3

microfilm document preparer; (2) an addresser for envelopes or typewriters; and (3) a cutter and paster of press clippings.

The Social Security Administration ("SSA") Appeals Council denied the petitioner's request for review on September 14, 2021, thus making the ALJ's findings the Commissioner's final decision. Id. at 1–4. See generally Smith v. Berryhill, 139 S.Ct. 1765, 1775–76 (2019). Svendsen timely challenged the Commissioner's decision in her motion for summary judgment to this Court. More than three and a half years have passed since Ms. Svendsen first filed for disability benefits.

## II.   **DISCUSSION**

### A. **Standard of Review**

To receive disability insurance benefits, a claimant primarily bears the burden of establishing the existence of a disability under the Social Security Act. King v. Astrue, 564 F.3d 978, 979 n.2 (8th Cir. 2009); 42 U.S.C. § 423(a)(1)(D). Judicial review of the Commissioner's decision that the claimant has failed to establish by a preponderance of the evidence that she is disabled within the meaning of the Act – or when the impairment became sufficiently disabling – is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record as a whole. Schmitt v. Kijakazi, 27 F.4th 1353, 1358 (8th Cir. 2022). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Grindley v. Kijakazi, 9 F.4th 622, 627 (8th Cir. 2021) (internal quotation marks omitted). This Court "must consider evidence in the record that fairly detracts from, as well as supports, the ALJ's decision." Koch v. Kijakazi, 4 F.4th 656, 663 (8th Cir. 2021) (internal quotation marks omitted). "If, after reviewing the entire record, it is possible to draw two inconsistent positions, and the Commissioner has adopted one of those positions, we must affirm." Boyd v. Colvin, 831 F.3d 1015, 1020 (8th Cir. 2016) (internal quotation marks omitted).

The familiar five-step inquiry to determine disability eligibility is:

4

(1) Is the claimant currently performing substantial gainful activity (SGA)? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix I? (4) Does the impairment prevent the claimant from performing past relevant work? (5) Does the impairment prevent the claimant from doing any other work?

Twyford v. Comm'r, Soc. Sec. Admin., 929 F.3d 512, 515 n.2 (8th Cir. 2019) (internal quotation marks omitted); 20 C.F.R. § 404.1520(a).

## B. Whether ALJ Failed to Properly Identify All Svendsen's Impairments and Determine Their Severity

The first substantive issue raised by the petitioner is whether the ALJ properly categorized all her impairments as either severe or non-severe. Initially, Ms. Svendsen contends that the ALJ failed to properly categorize her narcolepsy, headaches, and chronic fatigue. However, as briefing continued, petitioner acknowledged that the ALJ did in fact list her narcolepsy as non-severe. See REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, doc. 18 at 1 n.1. While Svendsen's reply brief solely focuses on her headaches, the Court nevertheless still considers whether the ALJ did in fact categorize her chronic fatigue as well.

This Court will reverse the administrative proceedings below only when the ALJ failed to properly identify a medically determinable impairment. See Gilbertson v. Colvin, 2014 WL 795770, at *6 (D.S.D. Feb. 27, 2014) ("We note at the outset that the ALJ failed to consider plaintiff's vision loss in conducting the step four inquiry. This failure, alone, would be grounds for reversal.") (*quoting* in parenthetical Washington v. Shalala, 37 F.3d 1437, 1440 (10th Cir. 1994)). Properly identifying *all* impairments, both severe and non-severe, is crucial when formulating the petitioner's RFC, which is "often [] the most important issue in a social security claim." McDonald v. Schweiker, 698 F.2d 361, 364 (8th Cir. 1983) (internal citation omitted). This is because the RFC assessment only considers symptoms related to a medically determinable impairment. See SSR 96-8P, 1996 WL 374184 (SSA July 2, 1996). The relevant regulations go so far as to note it would be "incorrect to find that an individual has limitations beyond those caused by his or her medically determinable impairment[s] and any related symptoms." Id. at *1. The

5

ALJ is presumed to have properly discharged her duties below when she claims to have considered and reviewed all relevant evidence. See generally Wilburn v. Astrue, 626 F.3d 999, 1003–04 (8th Cir. 2010).

Here, the ALJ explicitly listed petitioner's degenerative disc disease to the cervical spine, degenerative joint disease to the right shoulder, obesity, and fibromyalgia as severe impairments. A.R. 17. While stepping into the realm of over-generalization, the ALJ then holds that "any other condition, not specifically mentioned in this decision, but that may be mentioned briefly in the record is not considered severe." Id. While Ms. Svendsen rightly notes that such broad assertions could hamper subsequent judicial review, the ALJ proceeds to properly lay out the reasoning why such other conditions are not severe. The ALJ carefully explained that Svendsen's mild lumbar spondylosis, narcolepsy, anxiety, and depression as "impairments [that] are non-severe." Id. at 18. But further digging is required to discern the judge's categorization of headaches and chronic fatigue.

Claimant is correct in noting that the ALJ's categorization of each medically determinable impairment was not a model of clarity. However, when parsing the substance of her opinion below, the ALJ properly categorized both the headaches and chronic fatigue as non-severe impairments.

The administrative record is rife with reports of headaches allegedly troubling Ms. Svendsen. See, e.g., id. at 1155, 1362, 1374, 1539, 1572, 1578, 1582, 1601, 1607, 1753, 1760, 1768.[1] While the ALJ did not pair headaches in her listing of which ailments were non-severe, the substance of her analysis requires this Court to find they were categorized as non-severe in the proceedings below. See id. at 22, 25–26. The ALJ acknowledged the claimant's complaints of "daily headaches," while noting "she takes no headache medication" before proceeding to assess the value of her treating physician Jacob Miller's

---

[1] The Commissioner rightly notes that some of these records are from before Svendsen's alleged onset date of September 1, 2018. Respondent is also correct in acknowledging that this evidence "may be helpful for historical purposes." DEFENDANT'S MEMORANDUM IN SUPPORT OF THE COMMISSIONER'S DECISION AND IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, doc. 16 at 4. The Court only cites to these records here to show the wide array of evidence before the ALJ when she made her determination on whether the headaches were severe.

notes concerning the petitioner's "frequent headaches." Id. at 22, 25. However, despite Dr. Miller treating Ms. Svendsen "every four months for two years for . . . frequent headaches," the ALJ clearly explained that she found the physician's opinion "unpersuasive" because of the checklist style box on which his conclusions were presented. See id. at 25–26. And the ALJ did not stop there. She found Dr. Miller's conclusions – which clearly included the headaches – as "overly restrictive" without "detailed support or rationale for those conclusions." Id. at 26. Finally, on the same page of her opinion, the ALJ lists why Svendsen's headaches, among other listed maladies' asserted severity was "not consistent with the medical evidence of the record." Id. While it would have been apt for the ALJ to have simply stated that "the headaches are non-severe," she nevertheless provided the needed substance to indicate such a conclusion was made at the proceedings below. It is undisputed that claims of headaches are entirely subjective. One cannot prove or disprove that another person has a headache.

Similar rationale forces petitioner's allegations of the ALJ's purported failure to categorize her chronic fatigue to fail. Ample evidence was presented to the ALJ concerning purported severe chronic fatigue. See, e.g., at 255, 868–69, 917, 942–43, 1017–18, 1116, 1158, 1374, 1572, 1605, 1607, 1753, 1768, 1778–80.[2] When the ALJ analyzed Dr. Miller's checklist form, she explicitly noted the physician's opinions concerning chronic fatigue, conclusions that were ultimately found "unpersuasive." Id. at 25–26. While straddling the line of insufficiency, the ALJ did categorize the chronic fatigue as non-severe – in substance over form – when explaining her divergence in conclusions from the physician review on the reconsideration stage in agency proceedings below. Id. at 1374. While the ALJ could have been more explicit in tackling whether each purported impairment was severe, there is sufficient evidence in the record to show each alleged malady was analyzed. It is irrelevant whether this Court would come out differently on classifying any of these impairments as severe at this

---

[2] Like above, *supra*, some of these records are before the alleged onset date and are presented here as indicia of what was before the ALJ when she categorized chronic fatigue as non-severe.

stage. Instead, this Court will only "disturb the ALJ's decision [] if it falls outside the available zone of choice." Krause v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (internal quotation marks omitted). Here, the ALJ provided substantial evidence on the record below as to why she found the headaches and chronic fatigue to be non-severe. These decisions should not be disturbed.

### C. Whether Administrative Judge Erred to Properly Evaluate Petitioner's Headaches and Fibromyalgia at Step 3

Next, Ms. Svendsen contends the ALJ erred by failing to properly evaluate whether her fibromyalgia and headaches were medically equivalent to a listed impairment. She is partially correct.

At Step Three, the ALJ must determine whether the petitioner's impairment – or combination of impairments – meet or equal the criteria of an impairment proscribed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (a "Listing"). See 20 C.F.R. § 404.1520(d). If any of the petitioner's impairments meet or medically equal a Listing, the analysis can stop: The "finding of disability is automatic." Ortman v. Saul, 2019 WL 6829207, at *10 (D.S.D. Dec. 13, 2019) (citing id., Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003)). However, in matters such as here, where the impairments are not on the Listings, the Commissioner – through the ALJ – must assess whether any of the petitioner's impairments are "closely analogous" to a Listing. 20 C.F.R. § 404.1526(b)(2). See generally Clarambeau v. Saul, 2020 WL 3097771, at *14 (D.S.D. June 11, 2020). Svendsen carries the burden to show her impairments meet or medically equal a Listing. Schmitt, 27 F.4th at 1358. To prevail, Ms. Svendsen must show that her "unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [she] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Id. (alteration and emphasis in original) (quoting Sullivan v. Zebley, 493 U.S. 521, 531 (1990)). Both headaches and fibromyalgia are addressed in turn.

1. *Headaches*

First, the petitioner argues that her headaches were not properly listed. But this can readily be disposed of; the ALJ did categorize the headaches as non-severe. See *supra* II.B. The Court can stop its analysis here because Svendsen's headaches were not categorized as severe and post no further scrutiny at step three.

2. *Fibromyalgia*

Next, the Court turns to whether the ALJ erred in her analysis of fibromyalgia against the applicable Listings. Like headaches, fibromyalgia is not a Listed impairment. SSR 12-2p requires ALJ's to assess whether a case of fibromyalgia is medically equivalent to Listing 14.09D for inflammatory arthritis, or, if a claimant cannot meet 14.09D, another relevant Listing, or whether it medically equals a Listing when combined with another medically determinable impairment. See Wheeler v. Berryhill, 2017 WL 4271428, at *3–4 (D.S.D. Sept. 26, 2017). See also SSR 12-2p, Section II(B) (explaining how the rule is "provid[ing] guidance on how we develop evidence to establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM), and how we evaluate FM in disability claims and continuing disability reviews under titles II and XVI of the [Act]".). "This provision is an inclusive analysis, that is fibromyalgia will be medically equal to a listing if it meets the criteria of Listing 14.09D or another listing within Appendix 1." Wheeler, 2017 WL 4271428, at *3. Put simply, the ALJ *must* assess whether a claimant's fibromyalgia is medically equivalent to Listing 14.09D.

The ALJ below failed to adequately compare Svendsen's fibromyalgia against Listing 14.09D. Listing 14.09D requires several requirements, specifically: (1) inflammatory arthritis as described in Listing 14.00D6; (2) repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss), and (3) one of the following at the marked level: (a) limitation of activities of daily living; (b) limitation in maintaining social functioning; or (c) limitation in completing tasks in a timely manner due to

9

deficiencies in concentration, persistence, or pace.  While the ALJ noted she "applied Social Security Ruling 12-2p," she simply did not show any work from which this Court can affirm on review.  A.R. 20.  At this stage, simply stating that she "considered [SSR] 12-2p, in conjunction with all other relevant listings," falls far short of what is required when assessing medically equivalent listings for fibromyalgia.  Id. at 21.

The Commissioner now contends that the ALJ is not required to "reference any specific listing in cases involving fibromyalgia."  DEFENDANT'S MEMORANDUM IN SUPPORT OF THE COMMISSIONER'S DECISION AND IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, doc. 16 at 10.  However, this Court has repeatedly held that the administrative judge *does* hold such an obligation.  See Clarambeau, 2020 WL 3097771, at *14–17; Ortman, 2019 WL 6829207, at *10–12; Wheeler, 2017 WL 4271428, at *3–4.  A sister district court has also arrived at the same result.  See Sturgeon v. Saul, 2020 WL 6822489, at *2 (E.D. Ark. Nov. 19, 2020).  True, Svendsen carries the burden to show that her ailments are medically equivalent to a Listing.  But the Commissioner also "carries the responsibility of reviewing [petitioner's] severe impairments for medical equivalence under the appropriate listing and agency regulations."  Sunderman v. Colvin, 2017 WL 473834, at *7 (D.S.D. Feb. 3, 2017).  "The Listings prong of disability benefits determinations is fundamental, and an ALJ must "show [her] work."  Kemnow v. Kijakazi, 2022 WL 855369, at *3 (E.D. Ark. March 22, 2022) (*quoting* Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005)).  The ALJ's error in not properly analogizing Ms. Svendsen's fibromyalgia to Listing 14.09D requires a remand for further limited adjudication.

### D.  Whether RFC is Supported by Substantial Evidence

Petitioner next argues that the RFC was not supported by substantial evidence because: (1) the ALJ focused on solely traditional objective findings that are inapplicable in the fibromyalgia context; (2) treating physicians' weights were improperly discounted; and (3) purported improper inferences were made concerning Svendsen's medical records concerning manipulative limitations and a sit/stand option.  Each argument is addressed in turn.

10

The ALJ must "determine[] a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own descriptions of [her] limitations." Koch, 4 F.4th at 667 (internal quotation marks omitted) (second alteration in original). See 20 C.F.R. § 404.1520(e). The "RFC finding will often be the most important issue in a social security claim." McDonald, 698 F.2d at 364 (citation omitted). "Although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner." Lawrence v. Saul, 970 F.3d 989, 995 (8th Cir. 2020) (internal quotation marks omitted). There must be some medical evidence that supports the ALJ's determination; administrative judges cannot conjure their own medical opinions. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004). Finally, the ALJ must consider pertinent "regulations set forth . . . that may help shed light on the intensity, persistence, and limiting effects of symptoms." Lawrence, 970 F.3d at 995.

1. *Fibromyalgia*

First, the claimant argues that the ALJ erred by not properly considering all relevant factors related to the unique challenges surrounding fibromyalgia. She is correct.

"Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest important to disability law, its symptoms are entirely subjective.'" Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) (alteration in original) (*quoting* Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996) (Posner, J.)). As this Court has previously noted, "the musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Clarambeau, 2020 WL 3097771, at *24 (*quoting* Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010) (per curiam) (*quoting* STEDMAN'S MED. DICTIONARY (27th ed. 2000))). Particularly in the fibromyalgia context, a "patient's report of complaints, or history, is an essential diagnostic tool." Id. (*quoting* Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003)). This Court has favorably cited before to the United States Court of Appeals for the Sixth Circuit's analysis of fibromyalgia in Rogers v. Commissioner of Social

11

Security, 486 F.3d 234, 250 (6th Cir. 2007).  See, e.g., Outour v. Saul, 2020 WL
1663358, at *29–30 (D.S.D. Apr. 3, 2020).  In Rogers, the Court noted that "[u]nlike
medical conditions that can be confirmed by objective medical testing, [F]ibromyalgia
patients present no objectively alarming signs . . . fibromyalgia is an elusive and
mysterious disease which causes severe musculoskeletal pain. . . Fibromyalgia patients
manifest normal muscle strength and neurological reactions and have a full range of
motion." Rogers, 486 F.3d at 243–44.  Crucially, the Rogers Court held that "in light of
the unique evidentiary difficulties associated with the diagnosis and treatment of
fibromyalgia, opinions that focus solely on objective evidence are not particularly
relevant." Id. at 245.  It is sometimes called a "diagnosis of last resort."

     As previously explained, *supra* II.C.2., the SSA promulgated SSR 12-2p, which
lays out binding instructions on how to properly conduct analyses surrounding
fibromyalgia, a disease with particularly challenging contours to assess.  SSR 12-2p
mandates ALJs to parse the record for "widespread pain and other symptoms *associated*
with [fibromyalgia]." (emphasis added).  These associated symptoms include: (1) history
of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms,
signs, or co-occurring conditions, with particular focus on manifestations of fatigue,
cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety
disorder, or irritable bowel syndrome; and (3) evidence that other disorders could cause
these repeated manifestations of symptoms, signs, or co-occurring conditions were
excluded.  SSR 12-2p.  See also id. at n.9 (directing reader to 20 C.F.R. §§ 404.1528(b),
416.928(b) for relevant "somatic symptoms" for fibromyalgia signs).  Because of the
inherent difficult in assessing the severity of one's fibromyalgia, these associated
symptoms are crucial to tackle in any ALJ's RFC analysis.  See Forehand v. Barnhart,
364 F.3d 984, 987 (8th Cir. 2004) (explaining how fibromyalgia is "chronic, and
[d]iagnosis is usually made after eliminating other conditions, as there are no confirming
diagnostic tests . . . We have long recognized that fibromyalgia has the potential to be
disabling") (first alteration in original) (internal quotation marks omitted).  While "not
every diagnosis of fibromyalgia warrants a finding that a claimant is disabled," Perkins v.

Astrue, 648 F.3d 892, 900 (8th Cir. 2011), the Eighth Circuit has reversed and remanded where the ALJ "misunderstood fibromyalgia" when it materially affected her ultimate RFC analysis. See Garza v. Barnhart, 397 F.3d 1087, 1089 (8th Cir. 2005) (per curiam). The crux of Svendsen's claim is that the ALJ failed to properly analyze these *associated* symptoms as part of her wider fibromyalgia consideration, which would be reversible error.

The Commissioner centers her argument on the ALJ's explicit assertion that she applied SSR 12-2p to her evaluation of Svendsen's fibromyalgia. See A.R. 20. While the respondent also argues ALJ's are not bound by SSR 12-2p, this Court has already explained why that is false. Within the backdrop of SSR 12-2p's binding nature on the ALJ below, the Court must discern whether associated symptoms were properly scrutinized within the wider fibromyalgia examination.

Here, the ALJ erred by not properly considering the petitioner's well-documented bouts of chronic fatigue and headaches in her ultimate RFC determination within the fibromyalgia context. While the ALJ "found the claimant has a severe medically determinable impairment for fibromyalgia," it was clear she was ambivalent on this ultimate disposition by noting Svendsen was being awarded the "benefit of the doubt." A.R. 20. This on its own would not necessarily be erroneous, but it becomes reversible error when documented associated symptoms were not properly discussed. The ALJ wrote that she "considered and applied [SSR] 12-2p," but her analysis points to the contrary. Id.

In her analysis of Svendsen's fibromyalgia, the ALJ siloed her discussion on the "objective examination[s]," examinations that binding regulations and precedent alert us are not the end-all be-all in these circumstances. Id. at 22. The ALJ's singular focus on traditional objective findings were inappropriate here where "musculoskeletal examinations reveal[ing] normal upper and lower extremity range of motion, stability, and normal muscle strength and tone bilaterally" cannot be the endpoint for RFC determinations surrounding fibromyalgia. Id. at 23. While Svendsen's "physical exam findings were generally unremarkable," it belies the realization that musculoskeletal and

13

neurological testing can oftentimes appear normal in fibromyalgia patients. <u>See</u> <u>Clarambeau</u>, 2020 WL 3097771, at *24 (<i>citing</i> <u>Johnson</u>, 597 F.3d at 410) (<i>citing</i> HARRISON'S PRINCIPLES OF INTERNAL MED. (16th ed. 2005)); <u>Ortman</u>, 2019 WL 6829207, at *16 (<i>citing</i> <u>Rogers</u>, 486 F.3d at 243–44). Here, the ALJ ought to have compared pertinent associated symptoms within her fibromyalgia RFC analysis, primarily located at A.R. 20, 22–23, specifically addressing Svendsen's chronic fatigue and headaches. <u>See</u> SSR 12-2p, Section II(B).

This Court takes no stance on how the ALJ's ultimate disposition of her RFC analysis within the context of fibromyalgia must turn on remand. The Commissioner rightly notes that it is up to the ALJ to determine what weight to give Ms. Svendsen's alleged headaches and chronic fatigue. Perhaps the ALJ will nevertheless arrive at the same conclusion as before. That is her prerogative. <u>See Swarthout v. Kijakazi</u>, 35 F.4th 608, 611 (8th Cir. 2022) ("[N]ot every diagnosis of fibromyalgia warrants a finding that a claimant is disabled.") (internal quotation marks omitted). But she can only do so once she clearly and explicitly factored in associated symptoms to fibromyalgia, namely in this instance, headaches and chronic fatigue as reported by the petitioner. Only then can the ALJ's decision stand on substantial evidence on the record.

### 2. *Treating Physicians' Opinions*

Next, the petitioner takes issue with the ALJ finding treating physicians Jacob Miller and Richard Hardies' opinions unpersuasive and less persuasive, respectively. Contentions regarding the ALJ's analysis of both doctors' opinions are addressed in turn.

Claims filed after March 27, 2017 (such as Svendsen's) provide new standards for weighing treating physicians' opinions. <u>See</u> 20 C.F.R. § 404.1520c. SSA revised its regulations to "provide individuals with a better understanding of [administrative judges'] determinations and decisions." REVISIONS TO RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844-01, 5854 (Jan. 18, 2017). Now, the Agency "will not defer or give any specific weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). "Instead, ALJs will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability;

consistency; relationship with the claimant; specialization; and any other factor that tends to support or contradict a medical opinion. Boettcher v. Kijakazi, 2022 WL 2068243, at *8 (D. Neb. June 8, 2022) (citing id.). It is critical that ALJs carefully explain the two most important factors: supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ need not use the magic words of "supportability" and "consistency," but it must be clear they were addressed. See Goss v. Kijakazi, 2022 WL 1511521, at *3 (E.D. Ark. May 12, 2022). The other factors, while important, need not be explained in detail. See, e.g., Joseph R.L. v. Kijakazi, 2022 WL 1720930, at *4 (D. Minn. May 27, 2022).

However, the new regulations do not offer a blank check for ALJs to arbitrarily assign weight to treating physicians. Rather, they remain bound to offer "good reasons" for "giv[ing] a treating physician's opinion little weight." Pierce v. Kijakazi, 22 F.4th 769, 772 (8th Cir. 2022). See also Despain v. Berryhill, 926 F.3d 1024, 1028 (8th Cir. 2019) ("A conclusory report from a treating physician may still be entitled to controlling weight if it is accurate when viewed in the context of the medical record."). "The 'more relevant the objective medical evidence and supporting explanations presented' and the 'more consistent' a medical opinion is with evidence from other medical and non-medical sources, the more persuasive the opinion should be." Boettcher, 2022 WL 2068243, at *8 (citing 20 C.F.R. §§ 404.1520c(c)(1),(2)).

ALJ's are right to be wary of checkbox-style forms offering unsubstantiated conclusions by physicians. Recently, the Eighth Circuit reaffirmed prior precedent which cautioned courts and ALJs on checklist style prognoses comprising "nothing more than vague, conclusory statements – checked boxes, circled answers, and brief fill-in-the-blank responses. Such forms, [the Court] explained, provide little to no elaboration, and so they possess little evidentiary value." Swarthout, 35 F.4th at 611 (internal quotation marks omitted). So, the Swarthout Court held, "[w]hen a treating physician's opinion appears on such a form, an ALJ permissibly may rely more heavily on other opinions in the record." Id. (internal quotation marks omitted). However, an ALJ cannot simply "discount[] the [treating physician's] opinion because it was on a 'check-the-box' form." Boettcher, 2022 WL 2068243, at *9. Rather, what is critical is whether the physician's

opinion was "fully supported by medical reports, objective evidence, and assessments in the record." Id. In sum, if a conclusory checklist style form is amply backed up by clear support in the record, such as through consistent past reports of the same treating physician who filled out the checklist, then the ALJ must carefully parse the greater record and its support for the underlying conclusions presented on the cursory form. See also Laber v. Kijakazi, 2022 WL 884589, at *5 (D.S.D. March 25, 2022) ("[E]ven when a checkbox or conclusory medical source opinion does not provide extensive explanations, the ALJ is required to view the medical source opinion in the context of the claimant's medical record.") (internal quotation marks omitted).

### a) *Dr. Jacob Miller*

First, Ms. Svendsen takes issue with the ALJ finding her treating physician Dr. Jacob Miller's conclusions on his checklist style form "unpersuasive." A.R. 26.  On his checklist form, A.R. 1753–59, Dr. Miller noted that he has treated the petitioner every four months for two years. Specifically, Dr. Miller's focus was on Svendsen's shoulder, hip, neck, back pain, chronic fatigue, and headache issues. Id. at 1753.  On the checklist form, where Miller checked the applicable boxes and offered barebones notes, he opined that the claimant could sit for one hour before alternating postures; stand and/or walk for approximately 15 minutes before returning to a seated position; and stand and/or walk for around 30 minutes before alternating postures through sitting, lying down, or reclining in a supine position. Id. at 1755–57.  Additionally, Dr. Miller noted, he believed Svendsen could sit for a total of four hours in an eight-hour workday; stand and/or walk for up to three hours in an eight-hour workday; and would need to rest, lie down, or recline in a supine position for two hours in an eight-hour workday. Id. at 1757.

Ultimately, though, the ALJ found this "unpersuasive." Id. at 26.  Crucially for this Court's review, the administrative judge explicitly tackled "supportability" and "consistency" in her analysis while also providing detailed support for her findings. First, the ALJ held that the checklist style form which Dr. Miller used was not backed by "[d]etailed support or rationale for those conclusions." Id. at 26.  The judge continued, finding that Miller's conclusions were "inconsistent with treatment records, which show

non-labored respirations, clear lungs bilaterally, and or regular heart rate and rhythm without murmurs or gallops." Id.  She also noted normal musculoskeletal range of motion, no cyanosis or edema to extremities, normal movement to lower extremity and gait, normal coordination, and reflexes. Id. So, the ALJ concluded, "the above opinion is overly restrictive and the claimant is capable of sedentary exertion with a sit, stand option and as described in the residual functional capacity." Id.

Miller diagnosed Svendsen with right lateral spondylitis, right rotator cuff tear, cervical disc disease with radiculopathy, and chronic headaches on his checklist form. Id. at 1753.  But the ALJ is right to note that prior treatments and records, including those from Miller himself, do not show the overly restrictive workplace limitations discussed for the first time on the barebones checklist.  Additionally, the ALJ noted other relevant diagnoses and observations from medical professionals that *do* show normal musculoskeletal range of motion, as well as other indicia of less inhibitions on Svendsen's abilities in the workplace than first presented by Miller on the checklist.[3] While Svendsen is correct in noting that the findings related to cyanosis and edema do not necessarily discredit Dr. Miller's checklist form's list of diagnoses, the ALJ carefully combed the record to make clear that the degree to Miller's barebones findings do not find significant support in past treatment.  Even if this Court disagrees with the ALJ's finding below on the value of Dr. Miller's diagnoses and conclusions on the checklist form, it cannot and will not supplant the properly documented findings by the ALJ that secure her conclusions through careful analysis and ultimate conclusion that the form was not properly supported and consistent with the wider record.

The Commissioner directs this Court's attention to the Eighth Circuit's recent opinion in Swarthout, where the Court analyzed similar questions under the SSA's prior rule, 20 C.F.R. § 404.1527(c), not § 404.1520c.  Swarthout aptly explains prior case law on the matter, cautioning courts to be leery of unsubstantiated checklist forms which can

---

[3] Petitioner rightly notes that some of these citations to Exhibit 14F of the Administrative Record relate to kidney stone issues not relevant to the finding of disability below. MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, doc. 11 at 33.  However, part of Exhibit 14F *does* acknowledge normal musculoskeletal range of motion, and other relevant matters for this stage of adjudication. See, e.g., A.R. 1905.

consist of "nothing more than vague, conclusory statements – checked boxes, circled answers, and brief fill-in-the-blank response." Swarthout, 35 F.4th at 611 (internal quotation marks omitted). "Such forms, we explained, provide little to no elaboration, and so they possess little evidentiary value." Id. (internal quotation marks omitted). Critically, in Swarthout, the checklist form authored by the treating physician was "in tension with her own treatment notes." Id. There, "[t]he more severe limitations that would prevent Swarthout from working appear for the first time in the check-box form," as well as the fact "[o]ther objective medical evidence in the record contradict[ed] [the treating physician's] evaluation of Swarthout's physical limitations. Id. While Dr. Miller's conclusions on the checklist form do not necessarily contradict past treatment notes like in Swarthout, Miller's "more severe limitations that would prevent [petitioner] from working appear for the first time in the check-box form." Id. The ALJ was within her purview to be dubious of these significant impingements on Svendsen's ability to work when not clearly embraced in the record. The ALJ determined the persuasiveness of Dr. Miller based on supportability and consistency in the record; this Court must respect the ALJ's findings below. See Boettcher, 2022 WL 2068243, at *8.

Courts must be leery of ALJs "playing doctor" and cherry-picking from the record. Pate-Fires v. Astrue, 564 F.3d 935, 946–47 (8th Cir. 2009). But this is no such case. Here, the ALJ found Dr. Miller's severe restrictions on Svendsen's ability to work, first presented in such drastic detail on the barebones checklist, inconsistent with prior treatment notes from Miller and other providers. The ALJ is backed by substantial evidence on the record as a whole and her finding related to Miller will not be disturbed.

b) *Dr. Richard Hardie*

Next, Dr. Richard Hardie. Hardie examined Ms. Svendsen in January 2019 for "[m]oderate hypersomnia due to narcolepsy without cataplexy and/or idiopathic hypersomnia improved on Dexedrine." A.R. 1769.[4] He went on to recommend

---

[4] "Narcolepsy that occurs without cataplexy is known as type 2 narcolepsy." *Narcolepsy*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/narcolepsy/symptoms-causes/syc-20375497 (last visited July 13, 2022). See E.S. v. Sec'y of Health & Hum. Servs., 2020 WL 9076620, at *24 (C.O.F.C. Nov. 13, 2020) ("Type 2

"therapeutic napping during the day" as well as at least six hours of sleep a night. Id. The ALJ found Hardie's conclusions "less persuasive." Id. at 26. The ALJ did not give Hardie's findings much weight because of their "vague" nature and because he did "not identify when or how long the claimant should nap." Id. Further, "[t]here is no indication that the claimant could not take a nap after coming home from work." Id. And, in terms of consistency, the ALJ properly noted that it is "inconsistent with the record, which shows her narcolepsy [] stable or well controlled with medication." Id. True, Dr. Hardie noted in January 2019 that Svendsen took one to two naps a day. See id. at 1792. But only several months prior, Hardie wrote in May 2018 (before the alleged onset date) that "[a]s long as she remembers to take [her medication,] her drowsiness is well controlled." Id. at 1580. See Cronin v. Saul, 945 F.3d 1062, 1069 (8th Cir. 2019) ("Conditions that are controlled with treatment are not considered disabling.") (internal citation omitted).

The ALJ was correct to note such a split in the record: (1) that Svendsen *could* benefit from sporadic and brief napping; but that (2) her drowsiness could be well-contained through medication; as well as (3) unclear answers on whether such naps could occur after the workday. Because Dr. Hardie's four-sentence "Impression and Recommendations" does not go into significant detail on the nature of Svendsen's sleepiness, any detail on the duration or need of mid-day naps (and whether these could occur after the workday), as well as inconsistent support with his prior records, the ALJ was well within her purview to consider the perfunctory conclusion "less persuasive." Id. at 26.

### 3. *Physical Limitations*

Next, the parties dispute whether (1) the ALJ's findings concerning no manipulative limitations were applicable – against the recommendations of both state agency physicians as well as Svendsen's treating physician – as well as (2) whether her

---

narcolepsy is "a less severe form not accompanied by cataplexy, and not also believed to be autoimmune-driven.") (internal citations omitted).

conclusions concerning sitting and standing was supported by substantial evidence on the whole. Each argument is addressed.

a) *Manipulative Limitations*

Before reaching the ALJ's conclusions, a delve into what the varying state physicians found in their reviews concerning petitioner's purported manipulative limitations is necessary. The first State medical expert reviewed Ms. Svendsen's file in February 2019, finding some manipulative limitation at hand, specifically that petitioner could only occasionally life and/or carry 20 pounds, but concluding that she could frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for more than six hours on a sustained basis in an eight-hour workday. Id. at 1366.

At the reconsideration level in November 2019, the State agency physician also found that Ms. Svendsen could only occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for roughly six hours in an eight-hour workday; as well as sit (with normal breaks) for a total of about six hours in an eight-hour workday. Id. at 1376. The physician explained that his prescribed limitations were based on "cervical DDD [degenerative disc disease] with chronic neck/shoulder pain." Id. The reconsideration physician found near identical conclusions to postural limitation as the initial review expert, but parted ways by finding Svendsen could only crawl "occasionally," compared to the initial review's finding of unlimited crawling, as well as concluding Svendsen suffered from chronic fatigue syndrome. *Compare* id. at 1376, 1374, *with* id. at 1366, 62. Further, both physicians found that petitioner had only "limited" reach over her head. Id. at 1366, 1376. In his analysis, the reconsideration physician noted that "thorough physical exams are negative for severe and significant problems," after considering claimant's chronic neck pain, headaches, hip impingements, fibromyalgia, chronic fatigue, and narcolepsy. Id. at 1377. So, both State agency medical experts, as well as treating physician Miller, found apparent manipulative limitations on Svendsen. The ALJ did not.

As previously explained, the ALJ ultimately found Miller's checklist style form (but not his prior reports), unpersuasive. Here, the ALJ also tossed aside both State medical experts' findings concerning manipulative limitations offering these two experts' conclusions only as "somewhat persuasive." Id. at 25. The ALJ held that "manipulative limitations are not warranted as physical exam findings revealed full strength with elbow flexion and extension, wrist flexion and extension, finger flexion and extension, and thumb opposition, as well as generally full active and passive shoulder range of motion with flexion, extension, abduction, and rotation." Id. Despite the consistency among these three physicians, Dr. Miller and the two state experts, the ALJ tossed aside their repeated assertions of existing manipulative limitations. But this is within the ALJ's prerogative, so long as there is "some medical evidence" before her to depart from these three medical opinions. Koch, 4 F.4th at 667 (internal quotation marks omitted). See Schmitt, 27 F.4th at 1360 ("[T]here is no requirement that an RFC finding be supported by a specific medical opinion.") (internal quotation marks omitted); see also Roggentien v. Colvin, 2017 WL 325827, at *2 (N.D. Iowa Jan. 23, 2017) ("Instead, the ALJ may rely upon a variety of opinions, or even the medical records themselves.") (internal citations omitted).

The ALJ rested on three exhibits for her finding of no manipulative limitation. First, Exhibit 6F-8.[5] Here, the judge cited to Exhibit 6F for the proposition that there was "normal upper and lower extremity range of motion, stability, and muscle strength and tone bilaterally." A.R. 25. In Exhibit 6F, Dr. Lisa Wurnig-Johnson of Avera St. Luke's Hospital noted that Svendsen claimed her "range of motion" as "fine." Id. at 1760. In another portion of 6F-8 not explicitly cited by the ALJ, treating physician Miller notes that, when assessing the bilateral shoulder claims, Svendsen's range of motion was: "Full AROM [active range of motion] and PROM [passive range of motion] with flexion, abduction, adduction, internal/external rotation. Strength: 5/5 with flexion/extension, abduction, adduction, internal/external rotation." Id. at 1767. Next, Exhibit 14F. There,

---

[5] The relevant portion of Exhibit 7F-8 cited by the ALJ mirrors Exhibit 6F-8 and is thus not discussed.

Svendsen notes that she feels aggravated when raising the arm above the level of her head. Id. at 1823. This record also indicates that the right elbow had full and painless AROM and PROM. But see id. (finding that bilateral shoulder's range of motion is "[f]ull and painful AROM and PROM with flexion/extension.").

Ultimately, "[a] claimant's RFC is a medical question." Koch, 4F.4th at 667. While this may be a medical question, the ALJ is the one tasked with making the final determination on Svendsen's RFC, after adequately explaining which records and experts were awarded what weight. See Lawrence, 970 F.3d at 995 ("[A]lthough medical source opinions are considered in RFC, the final determination of RFC is left to the Commissioner.") (alteration in original) (internal quotation marks omitted). The Commissioner rightly notes that "there is no requirement that an RFC finding be supported by a specific medical opinion," meaning the ALJ was not bound by the persuasive conclusions offered by both State medical experts as well as Dr. Miller. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).

The ALJ was clear in awarding greater weight to those limited records that supported a full range of motion, such as Dr. Wurning-Johnson's notes and some of the notes in Exhibits 6F and 14F. She was also explicit in tossing aside manipulative limitation-related findings of the two State agency medical experts. Despite greater weight indicating some manipulative limitation, the ALJ could still be supported by the generous threshold of substantial evidence on the record review. See Swink v. Saul, 931 F.3d 765, 770 (8th Cir. 2019) ("The mere fact that some evidence may support a conclusion opposite to that reached by the Commissioner, however, does not allow this Court to reverse the decision of the ALJ.") (internal quotation marks omitted). What this Court must ascertain is whether the ALJ followed the proper steps in forming her finding of no manipulative limitation; if so, she is able to toss aside the work of the State physicians and treating physician Miller. See Dickson v. Berryhill, 2017 WL 1152038, at *7 (E.D. Mo. March 28, 2017) ("Express consideration of state agency physicians is sufficient to satisfy this standard."). The applicable standard of review asks if this was within the applicable "zone of choice." Kraus, 988 F.3d at 1024 (internal quotation

marks omitted).  While this finding would typically fall within the applicable zone of choice, it cannot in this instance because of previously explained failures in properly analyzing fibromyalgia.

As articulated above, *supra*, fibromyalgia is a tricky ailment to fully tackle.  Dr. Miller noted in August 2020 that petitioner was suffering from "[f]ibromyalgia affecting multiple joints."  A.R. 1826.  Remember, the ALJ found Miller's checklist style form as "not persuasive," but she did *not* make any such finding for the more elaborate records Miller supplied in prior visits.  So, if fibromyalgia is one (if not a driving) factor in Svendsen's joint pain, and with it, possible manipulative limitations, then the ALJ cannot find that that no manipulative limitations are at hand *without* first following the proper steps of assessing whether the claimant's fibromyalgia is medically equivalent to Listing 14.09D.  The ALJ must "show [her] work" by first explicitly referencing Listing 14.09D in reviewing Svendsen's fibromyalgia.  Kemnow, 2022 WL 855369, at *3 (internal quotation marks omitted.  Then, and only then, can this Court uphold the ALJ's determinations.  This does not mean the ALJ must reverse opinion on remand.  Rather, after fulfilling the regulatory commands of SSR 12-2p, she may arrive at the same conclusion.  Or not.  But until then, this conclusion cannot stand and the petitioner's claim should be granted.

### b)  *Sit/Stand Option*

Next, the sit/stand conclusion.  The ALJ found that petitioner would "need an opportunity to stand up and or change position at her workstation for approximately two to three minutes after sitting for an hour;" often referred to as the "sit/stand option."  A.R. 21.  However, the administrative judge had no applicable evidence to make a sit/stand option determination after discrediting Dr. Miller's checklist style conclusions.

The only source within the record for the length of a sit/stand option was within Dr. Miller's barebones check marks on the form discredited by the ALJ (which was within her purview to discredit).  On this form, Miller opined that Svendsen would need to stand or walk about 15 minutes before she must return to a seated position.  Id. at 1755.  Detrimental to the ALJ, though, is that there were no sit/stand option conclusions

offered by either State medical expert. See id. at 1365–68, 1375–78. Without further information in the record on what sort of sit/stand option could be applicable to Svendsen, the ALJ strayed too far into doctor over judge.

In a roughly analogous matter examined by a sister district court where the medical expert's "opinion [was] silent on a specific interval, and no other record evidence mentions or supports an interval (besides evidence the ALJ properly discounted), the ALJ was required to 'seek additional clarifying statements'" to further develop the "'crucial issue' of the sit/stand interval," which remained undeveloped. Orduna-Solorzano v. Kijakazi, 2022 WL 503731, at *7 (E.D. Mo. Feb. 18, 2022) (quoting Goff v. Barnhart, 521 F.3d 785, 731 (8th Cir. 2005)). See Grindley, 9 F.4th at 629–30 ("[T]he ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Undeveloped statements may exist when the report from [a] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.") (internal quotation marks and citations omitted) (second alteration in original). Like in Orduna-Solorzano, the only opinion concerning a sit/stand option was from a discounted physician (which again, was within the ALJ's purview). Without further support in the record, the crucial issue of a sit/stand option interval remains undeveloped and cannot stand on substantial evidence on the record.

Similarly, there is no narrative bridge between the two-to-three minute stand up and change position every hour conclusion and evidence which has not been discounted. "SSR 96-8p requires that, '[if] the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.'" Paula G.S. v. Saul, 2021 WL 1599229, at *32 (D.S.D. Apr. 23, 2021) (alteration in original) (quoting SSR 96-8p). Here, the ALJ properly explained why she discounted Dr. Miller's barebones checklist style conclusions. But in discounting it, she had no anchor for the two-to-three minute per hour sit/stand option when the State medical experts offered no sit/stand option conclusion themselves. Without the State experts' offering such a

24

sit/stand option, or other physicians or notes within the record, there is no bridge between the two-to-three minute per hour option and the evidence before the ALJ. See John B. H., 2021 WL 1192930, at *29 (D.S.D. March 30, 2021) ("Although SSR 96-8p does not require an itemized discussion of each limitation in the RFC and the record support therefor, it does require that the ALJ discuss the medical and non-medical evidence in a way that supports each conclusion.").

Additionally, and independently, the sit/stand option determination requires a remand for similar reasons as stated above in terms of manipulative limitations. Because the ALJ must assess whether the claimant's fibromyalgia is medically equivalent to Listing 14.09D and step further into a fibromyalgia-centric analysis with differing weighting of objective and subjective symptoms, further development is required below.

"A physician's opinion that a claimant is incapable of gainful employment is often not entitled to significant weight." Fentress v. Berryhill, 854 F.3d 1016, 1020 (8th Cir. 2017), as corrected Apr. 25, 2017 (internal citation omitted). The ALJ was well within her bounds to discredit the short, conclusory opinions on Dr. Miller's checklist style form. Further, she was proper in finding Dr. Hardie's short "Impressions and Recommendations" form only somewhat persuasive when considered against partially conflicting prior records and also its brief nature. And while the ALJ did not initially err in finding no manipulative limitation, despite evidence to the contrary, it requires a remand because of the unique requirements of analysis for fibromyalgia-related cases and its comparison against Listing 14.09D. Finally, the ALJ erred in not having evidence within the record to anchor her two-to-three minute per hour sit/stand option for Svendsen when the only medical opinion concerning a sit/stand option was discredited, as well as for errors in not engaging in the unique inquiries surrounding fibromyalgia.

### E. Whether the ALJ Properly Evaluated Petitioner's Subjective Symptoms

With similar threads to arguments discussed above, Ms. Svendsen argues that the ALJ did not properly weigh her subjective symptoms of fibromyalgia-related pain. She is right.

While the Commissioner did not specifically address this contention in her briefing, arguments made elsewhere in briefing support resistance to purported mis-weighing of subjective symptoms within the context of fibromyalgia. "We defer to the ALJ's evaluation of [] credibility provided that the determination is supported by good reasons and substantial evidence." Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014) (internal quotation marks omitted).[6] The ALJ is tasked with weighing the petitioner's subjective complaints against the well-worn Polaski factors. Grindley, 9 F.4th at 630. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). These include "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." Grindley, 9 F.4th at 630 (internal quotation marks omitted). See also Bryant v. Colvin, 861 F.3d 779, 782 (8th Cir. 2017) ("The adjudicator is not required to discuss each Polaski factor as long as [she] acknowledges and considers the factors before discounting a claimant's subjective complaints.") (internal quotation marks omitted) (alteration in original).

The ALJ is also tasked with assessing whether the petitioner has been seeking regular medical treatment on her purported disabling ailments. Turpin, 750 F.3d at 993. And "we do not consider impairments controllable by treatment or medication to be disabling." Id. (internal citation omitted). Further, "[a]n ALJ may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." Swink, 931 F.3d at 771 (internal quotation marks omitted). See also Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011). ALJs should also look to daily activities performed by claimants: "While daily activities alone do not disprove disability,

---

[6] In 2017, the Social Security Administration supplanted SSR 96-7p with SSR 16-3p. In doing so, the Administration removed the term "credibility," to make clear that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). See Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020) (explaining how "SSR 16-3p eliminates use of the term 'credibility' and clarifies that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole. SSR 16-3p . . . largely changes terminology rather than the substantive analysis to be applied.") Thus, prior case law under SSR 96-7p remains relevant and analogous to matters under SSR 16-3p.

they are a factor to consider in evaluating subjective complaints of pain." Swarthout, 35 F.4th at 612 (internal quotation marks omitted). Fibromyalgia cases, though, pose unique challenges that must be uniquely addressed.

The Eighth Circuit has "held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity." Brosnahan v. Barnhart, 336 F.3d 671, 677 (8th Cir. 2003). Again, this is because of the uniquely subjective nature of fibromyalgia and the difficulty in discerning objective indicia of its effects. See Tilley, 580 F.3d at 681 ("[Petitioner's] ability to complete light housework and short errands does not mean that she has the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful condition in which real people work in the real world.") (internal quotation marks omitted). So, in fibromyalgia cases, an additional step is set upon ALJs: they must specifically consider subjective assertions of disabling pain by claimants within the particular context of fibromyalgia, where typical activities such as cooking and cleaning are not offered as significant weight as in other impairments, and carefully explain on the record why subjective claims are being discounted within this *specific context* of fibromyalgia. To do any less would contradict clear precedential demands of an additional step of analysis in fibromyalgia-related matters.

Here, the ALJ properly listed the myriad of subjective claims of serious pain offered by Svendsen. These included "daily headaches" (although Svendsen admitted she does not take medication for it), inability to follow recipes, and to "lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, [and] use her hands." A.R. 22. One could well be suspicious of such a conclamation of complaints. Additionally, the ALJ looked to Svendsen's day-to-day living, such as her ability to care for household pets, partially attend to personal hygiene, "prepar[e] simple or frozen meals, complet[e] light household chores, driv[e] short distances, shop[] in stores or online, operat[e] a computer, and

spend[] time with family." Id.[7] This list of common activities was the anchor for the ALJ's finding that "the medical evidence, signs and findings upon *objective* examinations simply do not reflect the degree of limitations alleged by the claimant." Id. (emphasis added). But at the risk of sounding like a broken record, fibromyalgia poses unique challenges distinguishable from most other impairments, specifically its near exclusively subjective nature.

The ALJ could have reached the same conclusion that the record "simply do[es] not reflect the degree of limitations alleged by the claimant," but *only after* properly discounting the typical weight awarded to light household activities and analyzing them within the fibromyalgia-specific lens. Id. In sum, the ALJ must perform the additional step of explaining on the record this different weighing of subjective assertions versus objective findings when fibromyalgia is a critical crux of the inquiry. See Davis v. Astrue, 2012 WL 5902401, at *6 (W.D. Ark. Nov. 5, 2012) ("[P]erhaps of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory [or other] tests for the presence or severity of fibromyalgia."). Only then can the administrative judge be affirmed on review.

## F. Determining Proper Scope of Inquiry for Jobs in the "National Economy"

Finally, the petitioner argues that the ALJ erred by constraining her analysis of available jobs that she could perform at the national level, opposed to a more regional focus. She is right. This portion of the ALJ's analysis also and independently must be remanded so that the ALJ can tackle available jobs in the regional economy within the context of petitioner's fibromyalgia, as exhaustively explained above.

At Step 5, the ALJ turned to testimony from a vocational expert in determining the number of jobs available in the economy that the claimant could perform with her RFC to warrant, on the administrative judge's path to an ultimate finding of no disability. In

---

[7] The petitioner pushes against the ALJ's findings on her ease in performing household tasks as substantiated by evidence in the record. See MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, doc. 11 at 40–41. Because this matter is disposed on an error in not performing the extra step critical in fibromyalgia-related questions of subjective pain, the Court does not delve into claimant's counter on the actual extent of such household chores.

turn, the VE consulted – as is typically done – the Department of Labor's Dictionary of Occupational Titles ("DOT"), a document that egregiously has not been updated since 1991 and is comfortably divorced from reality in 2022. Here, the VE looks for jobs within the petitioner's RFC and whether they exist in ample numbers so that the ALJ can conclude that there are in fact sufficient jobs in the economy for a claimant to pursue. See *Dictionary of Occupational Titles – Fourth Edition, Revised 1991*, OFF. OF ADMIN. LAW JUDGES, U.S. DEP'T LAB., https://www.dol.gov/agencies/oalj/topics/libraries//-LIBDOT (last visited July 13, 2022). See also Poole v. Kijakazi, 28 F.4th 792, 795 (7th Cir. 2022) ("Needless to say, the fact that the DOT was last revised before the Internet revolution means that it is a resource that must be used with care.").

The ALJ found Svendsen unable to perform her past work as either (1) an office worker or (2) as an owner/operator of a bar and grill. A.R. 26–27.[8] Next, the ALJ turned to the VE, who characterized petitioner's past work as (1) a general clerk (DOT 209.562-010), and (2) as a manager of a liquor establishment (DOT 187.167-126). Id. at 27. The administrative judge noted that this past work was "substantial gainful activity" and performed "long enough for the claimant to achieve average performance and was performed within the relevant period." Id. See SSR 82-62. In this instance the VE testified that "an individual with the claimant's hypothetical limitation could not perform her past relevant work." Id. at 27. This conclusion was adopted by the ALJ.

Based on findings that the petitioner could not perform her past work and faced limitations on her ability to perform the entire range of sedentary work, see Medical-Vocational Rule 201.28, the VE testified as to what jobs the petitioner could perform. The expert posited she could be: (1) a microfilm document preparer (DOT 249.587-018), with approximately 18,000 jobs in the national economy, (2) an envelope or typewriter addresser (DOT 209.587-010), with roughly 3,000 jobs in the national economy, and a "cutter and paster of press clippings" (DOT 249.587-014), with about 2,000 jobs in the

---

[8] Frankly, these two occupations would seem to require little by way of strenuous activity.

national economy. Id. at 28. All three jobs are sedentary and unskilled (as well as divorced from the modern era).

The parties disagree on what exactly the proper field of inquiry is: must the ALJ (and thus, the VE) look at approximate number of available and applicable jobs within the framework of the country writ large, or within a more specific analysis of a claimant's specific region? The plain meaning of the text demands the latter.

"As always, we begin with the text." Sw. Airlines Co. v. Saxon, — S.Ct. —, 2022 WL 1914099, at *5 (June 6, 2022). See also United States v. Raiburn, 20 F.4th 416, 422 (8th Cir. 2021). 42 U.S.C. § 423(d) states:

> (d) "Disability" defined
>
> > (1) The term "disability" means –
> >
> > > (A) Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for   a continuous period of not less than 12 months;
> >
> > \*\*\*\*\*\*\*
> >
> > (2) For purposes of paragraph (1)(A) –
> >
> > > (A) An individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work btu cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means *work which exists in significant numbers either in the region where such individual lives or in several regions of the country*.

(emphasis added).  As this Court has previously explained: "What is clear from the above emphasized language is that 'work which exists in the national economy' is a term of art

in Social Security law.  It does not mean work in the entire United States.  Instead, it means 'work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country.'"  Porter v. Berryhill, 2018 WL 2138661, at *63 (D.S.D. May 9, 2018) (emphasis in original) (*quoting* 42 U.S.C. § 423(d)(1)(A)).  The text could not be clearer: nationwide numbers do not suffice.  See Heather R. v. Saul, 2021 WL 3080331, at *24 (D.S.D. July 21, 2021) ("Whatever the precise definition of region is, it does *not* mean nationally, nor does it mean the claimant's immediate area.") (internal quotation marks omitted).  True, at first glance, this may seem illogical: how can "work which exists in the national economy" not mean a survey of the nation writ large?  But the text clearly provides the answer: within this specific context, "national economy" is undoubtedly a term of art with two separate definitions, (1) those jobs with significant numbers in the specific "region" where a claimant lives; or (2) jobs in several regions of the country (i.e., several subdivisions of the country as a whole).  "Region" is undefined.  To argue that this carefully defined term, "national economy," means a generalist overview of national numbers is in clear contradiction of the statute's text.  This Court has time and time again arrived at this conclusion.  See Melvin W v. Kijakazi, 2022 WL 540274, at *3–10 (D.S.D. Feb. 23, 2022), Heather R., 2021 WL 3080331, at *23–26, Benthin v. Saul, 2021 WL 2982719, at *7–9 (D.S.D. July 15, 2021), Flatequal v. Saul, 2019 WL 4857585, at *26–27 (D.S.D. Oct. 2, 2019), Spring v. Saul, 2019 WL 4855186, at *33–39, (D.S.D. Oct. 1, 2019).  Here, the VE only supplied the ALJ with national numbers for the three (outdated) positions for which Svendsen qualified; accordingly, the findings below cannot withstand its deferential standard of review.

True, other sister district courts have used a more "pragmatic" approach in discerning what exactly work in the nationwide economy means.  See Evert v. Kijakazi, 2022 WL 1749611, at *6–7 (D.N.D. Feb. 17, 2022), Alice T. v. Kijakazi, 2021 WL 5302141, at *16–17 (D. Neb. Nov. 15, 2021), Hayden v. Saul, 2020 WL 888002, at *10–11 (E.D. Mo. Feb. 24, 2020).  And so have some circuit courts.  See Raymond v. Astrue, 621 F.3d 1269, 1274 (10th Cir. 2009) (Gorsuch, J.), Harmon v. Apfel, 168 F.3d 289,

31

292–93 (6th Cir. 1999). However, this Court is bound by the meaning of the text and will not go astray in the face of statutory commands, regardless of policy reasons offered by other courts.

The Commissioner overstates the breadth of circuit analysis antithetical to the repeated holdings of this District. Respondent cites to circuit court opinions where the regional vs. national debate does not appear to be briefed or argued. See Purdy v. Berryhill, 887 F.3d 7 (1st. Cir. 2018) (Souter, J.), Sanchez v. Comm'r of Soc. Sec., 705 F. App'x 95 (3rd Cir. 2017) (unpublished). The Commissioner also cites to a *per curiam* opinion void of meaningful analysis on the issue. See Lirley v. Barnhart, 124 F. App'x 283 5th Cir. 2005) (per curiam) (unpublished). Additionally, she cites to the Ninth Circuit's opinion in Gutierrez v. Commissioner of Social Security, which predominately focused on the proper classification of *regions*, *not* whether the ALJ can disregard § 423(d)(1)(A)'s commands altogether. See 740 F.3d 519, 523–29 (9th Cir. 2014). These opinions do not trump what the statute demands of this Court.

The Commissioner's well-researched briefing on relevant legislative history cannot rescue her argument. See DEFENDANT'S MEMORANDUM IN SUPPORT OF THE COMMISSIONER'S DECISION AND IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DOC. 16 at 24–25. True, the Eighth Circuit has noted in dicta that "[t]he legislative history shows that the intent of the [amendment including § 423(d)(2)(A)] is to provide a definition of disability which can be applied uniformly throughout the nation, without regard to local hiring practices or employer preferences." Dressel v. Califano, 558 F.2d 504, 509 (8th Cir. 1977) (*citing* S.REP.NO. 744, 90th Cong., 1st Sess. 49 (1967), *reprinted*, 1967 USCCAN, 2834, 2880–82). But Senate Reports do not trump text. See Azar v. Allina Health Servs., 139 S.Ct. 1804, 1814 (2019) (reaffirming that "legislative history is not the law.") (*quoting* Epic Sys. Corp. v. Lewis, 138 S.Ct. 1612, 1631 (2018)). Further, the legislative history is not fully divorced from the text itself. To reiterate, there are two definitions of "work which exists in the national economy;" while the first is the claimant's specific region, the second is "several regions of the country." 42 U.S.C. § 423(d)(2)(A). So, there remains the option for the VE and ALJ to ignore "local hiring

practices or employer preferences [of the claimant's specific region], or to the state of the local . . . economy [such as only looking to South Dakota]," if they elect to provide numbers for the second definition of "several regions of the country." HOUSE WAYS & MEANS COMM. REPORT 30 (Aug. 7, 1967), H.REP.NO. 544, 90th Cong., 1st Sess. True, the ALJ and VE would still have to compile numbers of specific regions, but they would not be constrained to only look at a claimant's exclusive region, and thus be an additional step detached from the unique character of any one specific economy or area.   While legislative history is "informative" and should be considered in dissecting ambiguous statutory provisions, "it does not override the plain meaning of the unambiguous text." Downs v. Holder, 758 F.3d 994, 997 (8th Cir. 2014). See id. ("Congress's authoritative statement is the statutory text, not the legislative history.") (quoting Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 599 (2011)).   However, as previously noted, what exactly is a "region" for this analysis?

There remains debate on what specifically constitutes a "region."  The SSA has not offered a meaningful definition, except to relatedly note that it is not equal to "immediate area."  See 20 C.F.R. § 404.1566(a)(1).  Courts have also offered differing answers.  See generally Barrett v. Barnhart, 368 F.3d 691, 691–92 (7th Cir. 2004) (per curiam) (explaining that proper inquiry is "whether [claimant] is so disabled that there are no jobs in reasonable proximity to where she lives that she is physically able to do.") (internal quotation marks omitted), Melvin W, 2022 WL 540274, at *5–6, 10 ("[T]he term 'region . . . is flexible' and can refer to 'the entire state' or to 'a particular area of the state.'") (alterations in original) (quoting Vargas v. Colvin, 2013 WL 6254784, at *4 (C.D. Cal. Dec. 4, 2013) (citing SOC. SEC. LAW & PRACTICE § 43:137 (Dec. 2013)), Heather R., 2021 WL 3080331, at *24.  At minimum, "it does not mean nationally, nor does it mean the claimant's immediate area."  Heather R., 2021 WL 3080331, at *24 (emphasis in original) (internal quotation marks omitted).  Ultimately, though, this Court need not decide the specific contours of "region" because the VE failed to proffer numbers below the national number at all.  On remand, the VE must supply approximate

job numbers at a regional scale so that the ALJ can determine if there are ample available jobs for the claimant either in her region or in other regions of the country.

Finally, the Commissioner throws the Hail Mary of arguing that the VE did not identify "uncommon jobs, such as a shrimp boat worker or tobacco farmer, which may not exist in many parts of the country," to seemingly contend any error below was harmless. DEFENDANT'S MEMORANDUM IN SUPPORT OF THE COMMISSIONER'S DECISION AND IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, doc. 16 at 27. The absurdity of the specific jobs offered by the VE bears discussion.

Again, the three jobs presented by the VE are microfilm document preparer, a mail/typewriter addresser, and a cutter and paster of press-clippings. This Court wonders how many today could pick microfilm out of a lineup, putting aside any discussion of its irrelevance today. Other courts have found microfilm document preparers as "plainly obsolete positions." Zacharopoulos v. Saul, 516 F. Supp. 3d 211, 223 (E.D.N.Y. 2021). The Court also finds this position "plainly obsolete" and not tethered to modern day America.

Next, the addresser. The addresser specifically relates to "[a]ddresses by hand or typewriter . . . May sort mail." DOT 209.587-010. No reasonable person can say with a straight face that addressing typewriters – yes, typewriters – is a position well-saddled in the 21st century. See Skinner v. Berryhill, 2018 WL 1631275, at *6 (C.D. Cal. Apr. 2, 2018) ("[I]t is not unreasonable to assume that the occupation of 'addresser,' which – as described by the DOT – provides for addressing envelops *by hand or by typewriters*, an occupation that has significantly dwindled in number since 1991 in light of technological advances. That being the case, a reasonable mind would not accept the VE's testimony that there are over 3,000 such positions in the region of California alone") (emphasis in original). See also Alaura v. Colvin, 797 F.3d 503, 508 (7th Cir. 2015) (Posner, J.) ("And does anyone use a typewriter any more?"). Not even the U.S. Postal Service sorts mail by hand.

Finally, the cutter and paster. Courts have consistently found that this position is "obsolete and [that] the DOT numbers [are] not believable." Hardy v. Comm'r of Soc.

Sec., 2021 WL 2695354, at \*3 (N.D. Miss. June 30, 2021) (internal citation omitted). See also Read v. Comm'r, Soc. Sec., 2016 WL 2610117, at \*4 (D. Md. May 6, 2016) (noting that cutter and paster is "patently obsolete."). Print newspapers continue to decline in circulation, and with it, the few remaining cutter and paster jobs (if any still actually exist). The Census Bureau recently noted that total estimated weekday circulation of American daily newspapers was 55.8 million in 2000. Adam Grundy, *Service Annual Survey Shows Continuing Decline in Print Publishing Revenue*, UNITED STATES CENSUS B., https://www.census.gov/library/stories/2022/06/internet-crushes-traditional-media.html (June 7, 2022). In 2020, the total circulation was 24.2 million.[9] How, then, can one say 3,000 cut and paste jobs remain in 2022? The answer is easy: you cannot. In 2022, the positions presented by the VE – such as a microfilm document preparer – are as ludicrous in Aberdeen as a circus supervisor (DOT 969.138-010), a fishing vessel dockhand (DOT 922.687-062), or a banana cutter (DOT 929.687-010). To argue there are ample jobs as a cutter and paster of press clippings is as nonsensical as arguing that "there are 3,600 head dance hall hostess positions in the [California-area] economy and 342,000 in the national economy." Farias v. Colvin, 519 F. App'x 439, 440 (9th Cir. 2013) (unpublished). Even the SSA itself has admitted "[i]t is doubtful that these jobs [including cutter and paster] as described in the DOT, currently exist in significant numbers in our economy. Mark Trapani & Deborah Harkin, *Occupational and Medical-Vocational Claims Review Study* 7, SOC. SEC. ADMIN. (May 2011).

Not only did the ALJ err by not properly considering available jobs within the specific analysis explained above for fibromyalgia, but also by failing to examine relevant regional job numbers. On remand, such specificity is required. "[W]e are not 'free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal.'" Sw. Airlines Co., — S.C.t —, 2022 WL 1914099, at \*8 (*quoting* New

---

[9] Circulation hits close to home for the petitioner: recently the claimant's hometown newspaper announced further restrictions to its print edition, eliminating Monday print delivery as of April 2022. See *American News will Cease Monday Home Delivery in April*, ABERDEEN AM. NEWS, https://www.aberdeennews.com/story/lifestyle/columns/-2022/03/21/aberdeen-american-news-stop-monday-home-delivery-april/7059482001/ (March 21, 2022). In addition, the local newspaper provides no paper at all on Sundays.

Prime Inc. v. Oliveria, 139 S.Ct. 532, 543 (2019)).  Perhaps legislative history indicates a possible intent of looking for available jobs at the national scale divorced from regional analyses.  But this Court cannot adopt legislative history at the cost of ignoring unambiguous text demanding the contrary.  See Bostock v. Clayton Cnty. Georgia, 140 S.Ct. 1731, 1738 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").  Had Congress ultimately meant a broader reading, "they 'easily could have drafted language to that effect.'"  Kemp v. United States, — S.Ct. —, 2022 WL 2111354, at *5 (June 13, 2022) (quoting Mississippi ex rel. Hood v. AU Optronics Corp., 571 U.S. 161, 169 (2014)).  However, these days, Congress mostly takes time off and raises money.  Instead, this Court reaffirms its (repeated) past holdings that specificity is required beyond sheer national numbers.  Rather, the ALJ (and the VE) must look to either (1) the approximate number of relevant jobs within Ms. Svendsen's specific region, or (2) the approximate number within several regions of the country.  Only then (and after reconsidering its findings within the nuanced analyses required for fibromyalgia), can the findings below withstand this Court's review.

### III.   REMAND

For the reasons explained above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Petitioner requests reversal of the Commissioner's decision with remand and instruction for an award of benefits, or, in the alternative, reversal with remand and instructions to reconsider her case.  The latter is appropriate in this instance.  The former is not.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by Commissioner Kijakazi.  Namely, it authorizes two types of remand orders: (1) a "sentence four" remand and (2) "sentence six" remand.  See Travis v. Astrue, 477 F.3d 1037, 1039–40 (8th Cir. 2007).  Sentence four remands authorize this Court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

See Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  In contrast, a sentence six remand is authorized in only two situations: (1) where the Commissioners requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings below.  42 U.S.C. § 405(g); Shalala v. Schaefer, 509 U.S. 292, 297 n.2 (1993).  Neither route under sentence six is applicable here.

Instead, a "sentence four" remand is appropriate.  However, a remand with instructions to award benefits is appropriate "only if the record overwhelming supports such a finding."  Buckner, 213 F.3d at 1011 (internal quotation marks omitted).  Here, while there is an improper denial of benefits, there is an absence of the necessary overwhelming evidence to support a finding of disability.  Rather, out of "an abundance of deference to the agency's authority to make benefits determinations," this Court leaves it to the ALJ to conduct further administrative findings and reexamine the record consistent with this Memorandum and Order.  Ingram v. Barnhart, 303 F.3d 890, 895 (8th Cir. 2002) (internal citation omitted).

## IV. CONCLUSION

This Memorandum and Order carefully explains why the petitioner's motion for summary judgment should be granted in part and denied in part.  The Court emphasizes that nothing in this opinion mandates the ALJ to ultimately conclude a finding of disability or not.  Rather, it simply tasks the ALJ below to reconsider the record before her within the proper statutory and regulatory framework.  Specifically, this Court holds that:

(1) The ALJ properly identified all of Svendsen's impairments and determined their severity;

(2) The ALJ properly evaluated her headaches at Step Three to a medically equivalent listing;

(3) The ALJ erred in not properly scrutinizing fibromyalgia alongside the relevant medically equivalent listing;

37

(4) The ALJ erred in not properly considering all relevant factors related to the unique challenges surrounding fibromyalgia when determining the RFC;

(5) The ALJ was within her purview to find Dr. Jacob Miller's conclusions "unpersuasive;"

(6) The ALJ was well within her bounds to conclude Dr. Richard Hardie's findings were "less persuasive;"

(7) The ALJ's findings related to manipulative limitations cannot stand when specific extra analysis is required related to the complexities surrounding fibromyalgia;

(8) The ALJ's findings on the sit/stand option cannot stand when void of support in the record and for not performing the additional analysis necessary for unique challenges in fibromyalgia matters;

(9) The claimant's subjective symptoms, specifically within regards to fibromyalgia-related pain, were not properly weighed; and

(10)   The ALJ and VE erred by not considering available jobs applicable to Svendsen at a more granular level than the nation writ large.

This Court is cautious to avoid "playing doctor." Pate-Fires, 564 F.3d at 946–47. However, in matters where errors in properly considering disability applications warrant remand, courts can and must require order adjudication by ALJs below. Nothing in this Memorandum and Order requires the ALJ to hold differently on remand; rather, the ALJ must tackle these specifically listed steps necessary to properly tackle fibromyalgia-related claims, as well as a more specific study of regional jobs within the larger national economy. Only then can the findings below be supported by substantial evidence on the record as a whole. As an aside, I fully recognize the tremendous demand on ALJs faced with increasing caseloads and inadequate support.

IT IS HEREBY ORDERED that petitioner's motion for summary judgment, Doc. 10, is granted in part and denied in part.

IT IS FURTHER ORDERED petitioner's claim that the ALJ erred in properly identifying all impairments and determining their severity, is denied.

IT IS FURTHER ORDERED petitioner's claim that the ALJ erred in properly evaluating whether headaches were medically equivalent to a Listing, is denied.

IT IS FURTHER ORDERED petitioner's claim that the ALJ erred in properly evaluating whether fibromyalgia was medically equivalent to a Listing, is granted.

IT IS FURTHER ORDERED petitioner's claim that the ALJ erred in properly determining the RFC in relation to fibromyalgia, is granted.

IT IS FURTHER ORDERED petitioner's claim that the ALJ erred in properly determining the RFC in relation to finding Dr. Jacob Miller's conclusions as unpersuasive, is denied.

IT IS FURTHER ORDERED petitioner's claim that the ALJ erred in properly determining the RFC in relation to finding Dr. Richard Hardie's conclusions as less persuasive, is denied.

IT IS FURTHER ORDERED that petitioner's claim that the ALJ erred in properly determining the RFC in relation to manipulative limitations, is granted.

IT IS FURTHER ORDERED that petitioner's claim that the ALJ erred in properly determining the RFC in relation to the sit/stand option, is granted.

IT IS FURTHER ORDERED that petitioner's claim that the ALJ erred in properly evaluating her subjective symptoms, is granted.

IT IS FURTHER ORDERED that petitioner's claim that the ALJ and VE failed to properly identify available jobs at one or more regional levels, is granted.

DATED this 13th day of July, 2022

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

40